In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00128-CV
_____

U.S. PLY, INC., Appellant

V.

ARCI, LTD., Appellee

_____

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 14-03-03055-CV
_____

**MEMORANDUM OPINION**

This appeal involves a dispute between a roofing subcontractor that installed roofs on two apartment buildings in Montgomery County and the entity that manufactured the roofing materials the subcontractor used to build the roofs. Following a bench trial, the trial court found in the subcontractor's favor and awarded damages. The manufacturer appealed and filed a brief, which raises ten issues for our review. We conclude the manufacturer's issues are either without

1

merit or were not properly preserved for appellate review. Thus, we affirm the judgment the trial court signed following the trial.

Background

The appellant, U.S. Ply, Inc., manufactures and sells an array of roofing materials used on commercial buildings. The performance of one of its products—RapidGRIP—is the product that lies at the heart of the parties' dispute. The evidence in the trial shows that RapidGRIP comes in rolls and that commercial roofing contractors use it in several applications to build commercial roofs. One of these involves using RapidGRIP as the middle layer of a three-ply roofing system. RapidGRIP is useful for this purpose because when correctly installed, it firmly bonds with the other two layers of roofing material. When finished, this category of roof is known as a three-ply, modified-bitumen roof.

ARCI, Ltd. is the subcontractor that purchased RapidGRIP and used it on the roofs that were the subject of the trial. The parties tried the case to the bench. By its verdict, the trial court found that the manufacturer misrepresented the qualities of the RapidGRIP to the subcontractor in connection with its purchase of RapidGRIP, that the manufacturer violated express and implied warranties associated with the sales, and that the repairs the subcontractor performed to correct the problems on the roofs, allegedly associated with the RapidGRIP's failure to create a sufficient bond

to the ply that it covered, were reasonable and necessary. The trial court also found that the subcontractor did not fail to store the RapidGRIP properly before using it or fail to follow any of the manufacturer's instructions and industry standards that were material to properly installing the modified-bitumen roofs.

U.S. Ply's product information sheet for RapidGRIP describes the product as a "SBS (Styrene-Butadiene-Styrene) self-adhering membrane[,] [m]anufactured with a strong fiberglass mat that is saturated and coated with a premium quality, 'high tack' asphaltic bitumen that is combined with durable SBS elastomers and protected by a poly release film for easy installation." The label indicates that RapidGRIP, in some roofing systems, may be "cold applied, SBS torch applied and SBS mop applied assemblies where applicable." In January and February 2013, ARCI used RapidGRIP as the middle layer of a three-ply, modified-bitumen asphalt roofing system on two apartment buildings that were built in Montgomery County. ARCI performed the work as a subcontractor working for the general contractor on the project, Construction Supervisors, Inc. The parties refer to the construction project as "Sunningdale," as do we.

The testimony in the trial shows that before building the roofs at Sunningdale, ARCI had over thirty years of experience installing roofs on commercial buildings, which included successfully building between 2,500 and 3,000 modified-bitumen

roofs using a self-adhering roofing membrane manufactured by one of U.S. Ply's competitors. Before using RapidGRIP at Sunningdale, however, ARCI had never used that brand of roofing membrane. The testimony from the trial shows that before ARCI decided to use RapidGRIP on its project at Sunningdale, ARCI's president, Jody Born, contacted Shawn Walker, a representative for U.S. Ply. Jody and Walker met to discuss using U.S. Ply's roofing products on the modified-bitumen roofs ARCI planned to build at Sunningdale. Jody testified that he told Walker about the products ARCI traditionally used to build modified-bitumen roofs, and that the roofing membrane they were using could be applied cold—that is, without using a torch. Jody explained that Walker told him that RapidGRIP was "as good or better" than the brand of roofing membrane ARCI had been using for this type roof.[1]

By late January or early February 2013, ARCI finished installing the RapidGRIP on roofs it built on the apartments at Sunningdale. As ARCI's work neared completion, the project's architect hired Building Exterior Solutions, L.L.C. (BES) to inspect the roofs to determine whether they were substantially complete. BES inspected the roofs in mid-February 2013 and then issued a report. In its report, BES noted five types of deficiencies in the roofs, including "[u]n-adhered laps in the

---

[1] Walker did not testify in the trial, and Jody's testimony is the only testimony in the record explaining what he and Walker discussed that led ARCI to switch from the products it had been using to U.S. Ply's products for these roofs.

adhered base sheet." The testimony and documents in evidence show the RapidGRIP membrane did not bond with the ply it was used to cover over large areas on both apartment's roofs.

In early April 2013, U.S. Ply signed an agreement with ARCI defining the scope of repairs and materials required to correct the problems associated with the RapidGRIP on one of the apartment buildings at Sunningdale. The parties refer to that building as building two. They refer to the building that U.S. Ply never agreed to repair as building one.

Under the repair agreement, U.S. Ply agreed to pay ARCI $57,524 for the labor required to repair the roof on building two with roofing materials that were supplied by U.S. Ply. BES recommended repairs due to problems with the RapidGRIP on both roofs. ARCI proceeded to repair the roofs on both buildings even though U.S. Ply only agreed to pay for the repairs to building two. On building two, ARCI replaced the roof under the terms of its repair agreement with U.S. Ply. To repair the roof on building one, ARCI added two additional layers of roofing material over the existing roof pursuant to the recommendation by BES to repair the roof that way.

Although ARCI provided the labor to repair the roof on building two, U.S. Ply never paid for the repairs based on the requirements of the written agreement

covering that building. In March 2014, U.S. Ply placed a check for $57,524 into the registry of the district court and sued ARCI seeking a declaratory judgment stating that it owed ARCI nothing for repairing the two roofs. U.S. Ply asked the trial court to declare the parties' rights. In response to the suit, ARCI counterclaimed, alleging that U.S. Ply was guilty of deceptive trade practices, had misrepresented the qualities of the RapidGRIP, and breached implied and express warranties accompanying ARCI's purchases of the RapidGRIP it used at Sunningdale. ARCI's live pleading alleges that in connection with ARCI's purchases of U.S. Ply's brand of roofing products, U.S. Ply represented that RapidGRIP is "self-adhering[,]" "would fully adhere[,]" and "that there was no additional attachment method needed" to install the product. U.S. Ply's live pleadings deny that the RapidGRIP used at Sunningdale failed to bond to the lower ply of the roofs on which it was used, that the RapidGRIP was defective, or that U.S. Ply misrepresented anything about RapidGRIP in connection with ARCI's purchase of its products.

In late 2016, the case went to trial. Before the trial began, the trial court re-aligned the parties, making ARCI the plaintiff and U.S. Ply the defendant. Thirteen witnesses testified over the course of a four-day trial. ARCI and U.S. Ply called expert witnesses, and each discussed why the RapidGRIP used at Sunningdale failed to bond to the bottom ply of the modified-bitumen roofs.

6

In mid-January 2017, the trial court signed a judgment awarding ARCI $171,105 in damages and $224,200 in attorney's fees, plus conditional awards of attorney's fees dependent on whether ARCI prevailed through each stage of any appeals. In mid-February 2017, U.S. Ply moved for new trial. It also filed a request asking that the trial court provide the parties with written findings of fact and conclusions of law. The trial court never filed written findings, and U.S. Ply filed a timely notice of appeal.

## Issues

U.S. Ply raises ten issues for our review in its brief. For convenience, we group and then analyze them under four headings: (1) is the evidence legally and factually sufficient to support the judgment; (2) did ARCI's alleged failure to follow U.S. Ply's instructions and industry standards when installing the RapidGRIP waive its right to recover on ARCI's implied and express warranty claims; (3) was the testimony of Bradley Hughes, ARCI's roofing expert, properly admitted and does it provide reliable support for the verdict; and (4) did ARCI preserve its right to obtain the trial court's written findings regarding the verdict.

## Standard of Review

Four of U.S. Ply's appellate issues argue the evidence is legally and factually insufficient to support the trial court's verdict. We address the standard for those

issues here. In an appeal from a bench trial, the trial court's findings of fact are reviewable under the same legal and factual sufficiency standards that are used to determine whether the evidence admitted during a trial is sufficient to support the jury's answer to the jury charge.[2] Stated another way, the trial court's factual findings "have the same force and dignity as a jury's verdict[.]"[3] When parties try the case to the bench, the trial court acts as the factfinder and judges the credibility of the witnesses, the weight to give to the testimony, and resolves any inconsistencies that may exist in the evidence before it in the trial.[4] In reviewing findings of fact, we credit evidence that supports the verdict if the trial court could have done so, and we disregard evidence that is inconsistent or contradicts the trial court's findings unless the court, given the evidence before it, could not have resolved the conflict in a way that favors its verdict.[5]

---

[2] *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

[3] *Anderson*, 806 S.W.2d at 794.

[4] *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

[5] *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller*, 168 S.W.3d at 827); *see Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied).

Here, the trial court failed to provide the parties with written findings of fact and conclusions of law in response to U.S. Ply's first request asking for them. U.S. Ply, however, then failed to notify the trial court that its findings were past due.[6] In the absence of written findings, we imply all findings of fact needed to support the judgment if there is evidence to support them.[7]

Under the legal-sufficiency standard of review, we consider the evidence admitted in the trial in the light that most favors the findings the appellant is challenging in the appeal.[8] We indulge every reasonable inference that can be made from the evidence in favor of the trial court's verdict, and then we determine whether the legally sufficient evidence was admitted during the trial to support the trial court's verdict.[9] If the trial court could have credited the evidence that it considered in favor of its verdict, we will too, and we must disregard evidence contrary to the verdict unless it is evidence the trial court could not have reasonably decided to

---

[6] *See* Tex. R. Civ. P. 297 (requiring a party to file a notice of past due findings if the trial court fails to provide its findings within thirty days of the date the party filed its original request for them).

[7] *See Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 401 (Tex. 2016) (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83-84 (Tex. 1992)).

[8] *See City of Keller*, 168 S.W.3d at 823.

[9] *Id.*

ignore.[10] Ultimately, after viewing the evidence in a favorable light, we must decide if the finding the appellant is challenging was reasonable given the evidence admitted in the trial.[11]

When the appellant raises factual-sufficiency complaints in its appeal, we examine all the evidence admitted in the trial to evaluate whether the evidence is factually sufficient to support the trial court's verdict.[12] When conducting a factual-sufficiency review, we view the evidence in a neutral light, and we are not authorized to set aside the findings being challenged unless the overwhelming weight of the evidence is contrary to the implied findings such that the verdict is wrong and unjust.[13]

When reviewing a trial court's conclusions of law, we apply a *de novo* standard.[14] On appeal, we cannot review a trial court's legal conclusions for factual

---

[10] *Id*. at 827.

[11] *Id*.

[12] *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

[13] *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Cain*, 709 S.W.2d at 176.

[14] *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

insufficiency.[15] Instead, the trial court's legal conclusions are reviewable to determine whether the trial court properly applied the law to the facts of the case.[16]

1.  Is the evidence legally and factually sufficient to support the judgment?

*Liability*

In its first, sixth, and seventh issues, U.S. Ply argues the trial court's judgment should be reversed because the trial court's findings are unsupported by evidence that is sufficient to support the trial court's conclusion that U.S. Ply misrepresented RapidGRIP's qualities or its conclusion that U.S. Ply breached any express or implied warranties that accompanied the relevant sales.[17] In support of these arguments, U.S. Ply relies heavily on the roofing report of its employee, Clint Freeman. Freeeman inspected the roofs in late-February 2013. U.S. Ply also relies heavily on a report of BES, authored by its employee Mike Hoecherl. Hoecherl

---

[15] *Id.*

[16] *Id.*

[17] In issue one, U.S. Ply also argues that not enough evidence was before the trial court to support its finding that ARCI needed to replace the roof that it installed on building one. U.S. Ply makes essentially the same argument in issue six. Because the arguments are so similar, we address them together in analyzing U.S. Ply's sixth issue.

inspected the roofs before they were completed. His report states the "modified bitumen roof system[s] [ARCI installed at Sunningdale] were not completed per industry standard roofing practices and the roof system manufacturer's guidelines." According to U.S. Ply, except for Hoecherl's testimony explaining why the RapidGRIP used at Sunningdale failed, the record contains no other admissible or reliable evidence explaining why the RapidGRIP ARCI installed malfunctioned.

In presenting its arguments, and to isolate the testimony the trial court considered from ARCI's roofing expert, Bradley Hughes, U.S. Ply suggests that his testimony was both inadmissible and unreliable. According to U.S. Ply, the trial court should not have allowed Hughes to testify because ARCI failed to provide it with a copy of Hughes' report by the discovery deadlines in the docket-control order that controlled the discovery deadlines in the case. Also, U.S. Ply argues that Hughes did not have the qualifications that he needed to determine why the RapidGRIP used at Sunningdale malfunctioned. U.S. Ply concludes that without the benefit of Hughes' testimony, the record does not contain legally or factually-sufficient evidence to support the implied findings that must be made to support the trial court's verdict.[18]

---

[18] U.S. Ply advances the same complaints about the admissibility and reliability of Hughes' testimony in issues two through five. We will address U.S. Ply's complaints about Hughes' qualifications and whether his testimony was

In general, the record shows that the parties presented the trial court with two conflicting theories to explain why the RapidGRIP malfunctioned when it failed to bond to the ply of roofing material that it covered. U.S. Ply claimed and produced evidence during the trial that ARCI failed to follow U.S. Ply's instructions for the product and to apply the product in accord with industry practices. Yet the record also contains evidence that ARCI properly installed the RapidGRIP and followed all of the material instructions and prevailing industry standards when installing the product. Additionally, the record before the trial court contains substantial evidence showing that the RapidGRIP used at Sunningdale would not bond to the ply of roofing material it covered without using a torch.

The final judgment the trial court signed does not specify the legal theory the trial court used to reach its verdict. To prevail on appeal, and because the trial court did not reduce its findings and conclusions to writing, U.S. Ply must establish that ARCI was not entitled to prevail on any of the theories of liability on which it relied

reliable in discussing those issues. Nevertheless, because we conclude that the trial court had the discretion to allow Hughes to testify and to find his testimony reliable, we conclude the trial court could reasonably rely on his testimony in reaching its verdict.

13

at trial.[19] Thus, U.S. Ply must establish in its appeal that the evidence before the trial court is insufficient to show that U.S. Ply violated the Deceptive Trade Practices Act (DTPA), breached any express warranties, or breached any implied warranties that apply to ARCI's purchases of the RapidGRIP it used at Sunningdale.[20]

Before examining the evidence relevant to ARCI's DTPA and implied warranty of merchantability claims, we examine the record to determine whether the evidence supports the trial court's judgment under ARCI's express warranty theory.[21] During the trial, ARCI claimed that it relied on various representations about RapidGRIP's qualities on the product's label and representations that Walker made during his meeting with Jody. The label on the boxes the RapidGRIP came in states the product is a "premium quality, 'high tack'" membrane and indicates that in some applications, RapidGRIP can be applied cold. The testimony in the trial

---

[19] *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 648 (Tex. App.—Dallas 2015, no pet.) ("An appellant must attack all independent bases or grounds that fully support a complained of ruling or judgment.").

[20] *See* Tex. Bus. & Com. Code Ann. § 2.313(a)(2) (West 2009) (providing that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description"); *id.* § 2.314(b)(6) (West 2009) (stating that, for a good to be merchantable, it must "conform to the promises or affirmations of fact made on the container or label if any"); *id.* § 17.46(b)(5) (West Supp. 2018) (making it a deceptive trade practice to represent that goods have characteristics or benefits they do not have).

[21] *See* Tex. R. App. P. 47.1.

reflects that a purchaser's ability to apply the product cold means the product can be applied without using supplemental heat, like a torch, to cause the product to bond with the upper and lower plies of a modified-bitumen roof. According to Jody, in his meeting with Walker, Walker told him that RapidGRIP is "as good or better" than the roofing membrane they were using regarding the quality of the membrane to stick on roofs during a conversation when Walker knew that ARCI intended to apply the product without using a torch.

Ultimately, ARCI requested that Construction Supervisors, the general contractor on the Sunningdale project, approve its request to use U.S. Ply products on the roofs that ARCI was hired to build at Sunningdale. Construction Supervisors forwarded the information about the roofs that it got from ARCI to the architect for the project and ARCI received the required approvals it needed to use U.S. Ply's products to build the roofs. The written materials that ARCI provided Construction Supervisors about RapidGRIP, which originated at U.S. Ply, state that RapidGRIP is a self-adhering, high-tack membrane that can be used at ambient temperatures of 50°F or higher and when RapidGRIP is at least 70°F if installed while exposed to direct sunlight without using supplemental heat. Based on the testimony about the circumstances showing how ARCI chose to use the RapidGRIP brand of roofing membrane for its work at Sunningdale, we conclude the record contains legally and

factually-sufficient evidence to support the trial court's implied finding that ARCI relied on information supplied by U.S. Ply to purchase the RapidGRIP that it used on the project.[22]

There is also evidence in the record that supports the trial court's finding that the qualities of the RapidGRIP ARCI used on the project did not conform to the product's label and the representations Walker made about RapidGRIP during his meeting with Jody.[23] The testimony in the trial established that Mid-States Asphalt manufactures RapidGRIP under specifications provided to it by U.S. Ply. In late-March 2013, after BES identified that there was a problem with the RapidGRIP ARCI installed on the apartment's roofs, U.S. Ply sent Mid-States Asphalt a part of the leftover roll that ARCI removed from one of the roofs at Sunningdale. U.S. Ply asked that Mid-States Asphalt test the roll. In an email, U.S. Ply told Mid-States Asphalt that U.S. Ply had conducted its own tests on the leftover roll of RapidGRIP, and that its tests showed the RapidGRIP "[could] be easily removed." Several days after sending the leftover roll, U.S. Ply sent a follow-up email to Mid-States Asphalt.

---

[22] *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 (Tex. 2002) (stating that reliance is an element a plaintiff must prove to show the defendant breached an "express warranty (to a certain extent)").

[23] *See* Tex. Bus. & Com. Code Ann. § 2.313(a)(2); *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 668 (Tex. 1996) (indicating that circumstantial evidence may establish a fact issue showing a product malfunctioned).

16

The email states: "[T]he RapidGRIP is not sticking to the base on the project. What [U.S. Ply] need[s] to know is whether or not the sample provided to you is mating properly . . . . or do you need supplemental heat or conditions to make that happen?" This email, along with the evidence showing that BES found problems with the RapidGRIP installed on the roofs, clearly shows that U.S. Ply wanted to know whether the leftover roll could be used for applications like those at Sunningdale without a torch because the label indicated the product could be used for that type of application if applied properly and within the temperatures that are stated on the product's label.

In late-March 2013, Mid-States Asphalt tested the leftover roll. After testing the roll, Mid-States Asphalt advised U.S. Ply, by email, that proper "adhesion will be achieved by simple torching down the finished roof covering over the Rapid[GRIP]." About thirty minutes after receiving that email, U.S. Ply replied: "That isn't our question nor concern – it is that it appears that it will not bond without a torch which is the complaint – that is what we want an answer to." About an hour later, Mid-States Asphalt informed U.S. Ply that "[using supplemental heat] will most definitely solve the problem. . . . So, yes supplemental heat will be required in order to facilitate the bond to the substrate. . . . I hope that this answers your

17

question." Later that same afternoon, Mid-States Asphalt offered to replace the RapidGRIP that ARCI used on its project.

We conclude the evidence admitted during the trial allowed the trial court to conclude as a reasonable finder of fact that the RapidGRIP failed to bond to the roof when applied without using a torch. ARCI installed the RapidGRIP under conditions significantly cooler than the conditions when U.S. Ply and Mid-States Asphalt tested the leftover roll. The tests on the leftover roll were conducted at around 75°F. U.S. Ply's report about its test of the leftover roll states: "Rapid[GRIP] did not adhere very well."

U.S. Ply argues the tests on the leftover roll were not relevant because by the time the roll was tested, it was no longer in the same or similar condition that it was in when it was sold. Based on that argument, U.S. Ply concludes the test results on the roll do not explain why the rolls of RapidGRIP ARCI used failed to bond to the lower ply of the roofs on which it was installed. To support this argument, U.S. Ply points to the evidence in the record from which the trial court might have found that ARCI failed to store or to install the RapidGRIP properly. According to U.S. Ply, the record establishes that storage and installation errors, not a malfunction in the RapidGRIP, explain why the RapidGRIP failed.

To prove causation on an express warranty claim, the plaintiff must prove the breach is a "substantial factor in bringing about" the plaintiff's injuries.[24] According to U.S. Ply, the overwhelming great weight and preponderance of the evidence shows the RapidGRIP malfunctioned because ARCI failed to store or to install the RapidGRIP it acquired properly. U.S. Ply argues that given the evidence about how the RapidGRIP was stored and installed, the leftover roll was no longer in a condition that it could be tested to determine what condition the rolls were in when ARCI acquired them. And it argues that ARCI's storage and installation errors caused the RapidGRIP to malfunction when the rolls did not bond to the roofs.

The record from the trial contains testimony from which the trial court might have found that (1) ARCI failed to roll the RapidGRIP with a weighted roller after placing it over the mechanically-fastened ply that it installed on the roofs; (2) ARCI did not install the RapidGRIP when the ambient air temperatures were at least 50°F and the RapidGRIP rolls were at least 70°F; (3) After ARCI rolled the RapidGRIP out on the roof, it then failed to protect its work in progress by covering the RapidGRIP with the top ply of roofing material before leaving its work overnight, thereby allowing the rolls that it installed each day to be exposed to the weather; (4)

---

[24] *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995)).

ARCI failed to seal the roof in various places before leaving work each day, creating another potential source of moisture that could interfere with the RapidGRIP's ability to bond to the other plies of roofing material used to build the roofs; and (5) ARCI failed to store the RapidGRIP to protect it from the effects of the weather and from sunlight before installing it. With respect to using a weighted roller, there is testimony in the record that shows that ARCI failed to use a weighted roller. RapidGRIP's label recommends that to achieve best results, it highly recommended rolling the RapidGRIP with a weighted roller. ARCI presented testimony showing that it customarily used four-pound brooms to press the roofing membrane into the roofing ply the membrane covered to make the plies contact each other, and that it followed that practice at Sunningdale. According to Jody, using brooms in the manner that ARCI uses them when building modified-bitumen roofs is an acceptable practice. He explained that U.S. Ply's application procedures recommend but do not require the use of weighted rollers. The testimony from the trial shows that ARCI viewed the statement on RapidGRIP's label about using a weighted roller as a recommendation, not as a requirement. Given the label and the testimony in the record, the trial court could have reasonably concluded that the use of weighed rollers was not required by the label, or that ARCI's failure to use a weighted roller did not play a substantial role in causing the RapidGRIP to fail.

ARCI also disputed U.S. Ply's claim that it installed the RapidGRIP under weather conditions inconsistent with RapidGRIP's label. During trial, ARCI relied on weather records to establish what the ambient air temperatures were when it installed the rolls of RapidGRIP at Sunningdale. The weather records in evidence cover the months of January through March 2013. The temperatures recorded are based on temperatures measured at an airport about 16 miles from Sunningdale. Based on these records, Jody testified that ARCI never installed the RapidGRIP when the ambient air temperatures were below 50°F or when the rolls were not at least 70°F. Jody's son, Marshall Born, also addressed whether ARCI installed the RapidGRIP under conditions inconsistent with those on the product's label. Marshall was ARCI's construction supervisor for ARCI's project at Sunningdale. He testified that ARCI's job foremen were familiar with the temperatures in which RapidGRIP should be installed. Marshall testified that ARCI's crews did not "work or install anything under those temperatures." Victor Robles, the ARCI foreman who supervised the crew that built the roof on building two, also testified in the trial. According to Victor, his crew installed the RapidGRIP when the air was at least 70°F on the roof.[25] Hughes and Jody testified that the temperatures on a building's roof is

_____

[25] The ARCI foreman in charge of installing the roof on apartment building one, Toro Mendoza, did not testify in the trial. Marshall explained that he had known Mendoza for over twenty years, that Mendoza left ARCI shortly after he finished

21

typically around 25% higher than the temperature when measured from the ground. We conclude the record contains conflicting evidence about whether ARCI installed the RapidGRIP at temperatures outside the temperatures found on the product's label. Nevertheless, the great weight and preponderance of the evidence does not show that ARCI installed the RapidGRIP when it was less than 50°F as claimed by U.S. Ply.

U.S. Ply also points to testimony and other evidence before the trial court that is critical of ARCI's workmanship. It relies on this evidence to support its claim that the tests on the leftover roll were unreliable or that they the trial court gave the tests entirely too much weight. U.S. Ply's brief, however, fails to address the evidence in the record that contradicts the evidence on which it relies. The record includes testimony disputing U.S. Ply's claim that ARCI failed to properly store U.S. Ply's roofing materials before installing them on the roofs. For example, Victor testified that during the construction process, ARCI stored and covered the RapidGRIP inside a garage at night. The instructions accompanying RapidGRIP state the product "must be covered and not left exposed for more than 90 days." There is no evidence in the record showing that ARCI exposed the RapidGRIP to the weather or to the effects

working on building one at Sunningdale, and that Mendoza left because he had "personal legal issues" and "personal stuff going on."

22

of the sun for ninety days, and no evidence that the product was left exposed to any extreme heat or cold. Generally, the testimony before the trial court shows that when using the RapidGRIP, ARCI's crews took the rolls out of the boxes they came in shortly before laying one or more rolls out on the roof where those rolls were to be installed. After removing a roll from a box, members of ARCI's crew laid the roll out to allow it to warm for a short period of time, less than an hour, before installing it over the bottom ply on the modified-bitumen roofs.

The record also contains evidence disputing U.S. Ply's claims that various issues with ARCI's workmanship explained why the RapidGRIP failed. ARCI's roofing expert, Hughes, explained that all but one of the deficiencies Hoecherl pointed out in his February 2013 report could be explained by the fact Hoecherl inspected the roofs before ARCI finished them. Hughes characterized most of the items Hoecherl criticized about the roofs as consisting of incomplete work, not poor workmanship. According to Hughes, ARCI's work at Sunningdale "met the standard of care and responsibilities for a roofing contractor within the industry."

Marshall also address whether ARCI left its work in progress under conditions that allowed moisture to penetrate the roofs. According to Marshall, ARCI did not leave the roofs overnight without first sealing the roofs' seams. While Marshall acknowledged that Hoecherl's photos show some areas where the roofs' seams were

23

not sealed, there is no testimony from any of U.S. Ply's experts showing that moisture penetrated the RapidGRIP and caused the RapidGRIP's failure in these areas or any others. Instead, the testimony of U.S. Ply's witnesses suggests that the penetration of the RapidGRIP membrane with moisture *could* explain why the RapidGRIP failed. The evidence before the trial court shows that ARCI presented evidence disputing U.S. Ply's theory that the presence of moisture below the RapidGRIP explained why the RapidGRIP failed. Jody testified that when Hoecherl was looking at the roofs, Hoecherl never told him that he found a place where moisture had penetrated the roof. Additionally, Jody testified that none of the people who inspected the roofs told him that the RapidGRIP failed because water penetrated the RapidGRIP on the roofs. In his testimony, Hoecherl agreed that he never saw any evidence where water migrated below the RapidGRIP.[26] Under the

---

[26] We note that Hoecherl stated that the absence of moisture does not show that no water entered the roof because water evaporates. Yet Hoecherl couched his testimony as problems that "could cause" a roof to fail and he never stated that, in his opinion, water penetrated the roofs and explained why the RapidGRIP malfunctioned. A letter that BES sent to the owner's architect in late-May 2013, which was signed by Jerry Abendroth, who is the partner in charge of the investigation BES was hired to do at Sunningdale, states that "[s]ince BES was not involved during the installation of the roof system, we are unable to definitively determine the cause or extent of the un-adhered roof membrane." This letter was also admitted into evidence during the trial.

circumstances, the trial court could have concluded that water penetration either did not occur or was not a substantial cause for the RapidGRIP's malfunction.

We conclude the record contains conflicting evidence about whether ARCI's storage, workmanship, or installation errors caused the roofs to fail.[27] In a case tried to the bench, the trial court acts as the factfinder and determines what testimony it finds credible.[28] It also weighs the relevant evidence when resolving the contested issues of fact in a trial.[29] On this record, we conclude the trial court could have reasonably rejected U.S. Ply's claims that the RapidGRIP malfunctioned because ARCI failed to store or install it properly. We further conclude that legally and factually sufficient evidence supports the trial court's findings on ARCI's breach of express warranty claims. Because we have found the record supports the trial court's verdict on ARCI's breach of express warranty claims, we need not address whether

---

[27] *See City of Keller*, 168 S.W.3d at 814 (explaining that under a legal sufficiency review, the appellate court cannot disregard evidence that would allow the factfinder to make only one inference).

[28] *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998) (explaining that under a factual sufficiency review, the appeals court cannot substitute its conclusion for that of the factfinder when the factfinder's conclusion is supported by the inferences reasonably available from the evidence admitted in the trial).

[29] *Id.*

25

the evidence also supports the judgment on its breach of implied warranty and DTPA claims.[30] For these reasons, we overrule U.S. Ply's first, sixth, and seventh issues.

*Damages*

In issue eight, U.S. Ply argues the evidence does not support the trial court's conclusion that ARCI was entitled to damages for replacing the roof on building one.[31] According to U.S. Ply, because it was willing to guarantee the original roof on building one, the expenses ARCI incurred to replace it were unnecessary. In response, ARCI argues it did not replace the roof on building one, but instead repaired the roof by adding additional layers of roofing material over it based on the repair method recommended to the project's owner by BES.

The evidence admitted in the trial shows that BES, who was hired by Sunningdale's architect, recommended that ARCI repair the roof on building one by "[overlaying it] with a new two-ply modified bitumen roof system."[32] Steve Kratky,

---

[30] *See* Tex. R. App. P. 47.1.

[31] In its appeal, ARCI has not disputed the damages the trial court awarded to compensate ARCI for repairing the roof on building two. In closing argument, U.S. Ply's attorney conceded that U.S. Ply owed ARCI for those repairs.

[32] The recommendation to use an overlay repair on the roof came from Kevin Palma and Jerry Abendroth. Abendroth testified in the trial that he helped start BES, and the letter he signed shows that he was the project manager for BES for the evaluation the company did on the roofs at Sunningdale.

a Construction Supervisors' employee, was involved in the discussions that occurred between ARCI and Construction Supervisors about the repairs needed on building one. During the trial, Kratky testified that ARCI repaired that roof by overlaying the existing roof system with other plies of material that are used to build modified-bitumen roofs. While U.S. Ply misstates the evidence in claiming the roof was replaced, we nonetheless understand its argument to assert that the cost ARCI incurred to repair the roof on building one was unnecessary because U.S. Ply was willing to guarantee it despite the problems BES and ARCI observed with the roof ARCI installed on building one.[33]

The premise of U.S. Ply's argument is that ARCI acted unreasonably by rejecting its offer to issue a guarantee on the roof. The language in a sample guarantee issued by U.S. Ply for roofs is among the exhibits admitted in the trial. Its terms are relevant to evaluating whether ARCI acted reasonably when it rejected U.S. Ply's offer to guarantee the roof on building one. The terms of U.S. Ply's guarantee reveal that the guarantee, had one been issued, would have covered only nine designated risks relevant to problems with roofs while excluding eleven others.

---

[33] *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver.").

Additionally, the terms of the guarantee extend only to the roof's "original owner." There is no testimony in the record showing that Sunningdale's owner agreed to accept U.S. Ply's offer. Thus, the guarantee, even had ARCI agreed to it, would not have protected ARCI from the claims that it breached its subcontract with Construction Supervisors by building a roof that did not fully comply with it contract with Construction Supervisors.

The fact the proposed guarantee would include exclusions while covering only certain risks further supports the trial court's implied finding that ARCI did not act unreasonably when it rejected U.S. Ply's proposal to accept the guarantee in lieu of filing suit. Under Texas law, a plaintiff is duty-bound to mitigate any damages it may suffer, but the plaintiff need not sacrifice its own contract rights in doing so.[34] We note that when the defendant claims the plaintiff failed to mitigate damages, the defendant bears the burden of proving that claim.[35] On this record, as a reasonable finder of fact, the trial court could have decided that U.S. Ply failed to carry its

[34] *See Tex. Gas Expl. Corp. v. Broughton Offshore Ltd. II*, 790 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1990, no writ); *Fid. & Deposit Co. of Md. v. Stool*, 607 S.W.2d 17, 25 (Tex. Civ. App.—Tyler 1980, no writ); 49 DAVID R. DOW & CRAIG SMYSER, TEXAS PRACTICE: CONTRACT LAW § 10.6 (last updated Sept. 2018). We note that U.S. Ply's pleadings include a claim that ARCI failed to reasonably mitigate its damages.

[35] *See Kartsotis v. Bloch*, 503 S.W.3d 506, 521 (Tex. App.—Dallas 2016, pet. denied).

burden in proving that ARCI acted unreasonably by rejecting the proposed guarantee.[36] We overrule U.S. Ply's eighth issue.

### 2. Did ARCI's alleged failure to follow U.S. Ply's instructions and industry standards when installing the RapidGRIP waive its right to recover on its warranty claims?

In issue nine, U.S. Ply argues that by installing the RapidGRIP incorrectly, ARCI voided any warranties that might apply to installing the roof on building one. Even when we construe U.S. Ply's argument liberally, however, U.S. Ply's argument relies on ARCI's conduct as the basis for any waiver. U.S. Ply does not rely on any waiver language on the product's label or other information that U.S. Ply provided ARCI in support of issue nine.[37]

Under Texas law, a plaintiff's conduct is not a defense to a breach-of-warranty action.[38] Instead, the plaintiff's conduct, including any claims alleging the plaintiff

---

[36] *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (explaining that the "matter of law" legal-sufficiency standard applies when the factfinder's adverse finding is one on which the party bore the burden of proof).

[37] *See Perry*, 272 S.W. 3d at 587 (requiring briefs to be construed reasonably, but liberally); *see also* Tex. Bus. & Com. Code Ann. § 2.313(a)(2) (indicating that the manufacturer's description of its goods creates an express warranty when the description forms a basis of the parties' bargain).

[38] *See Signal Oil & Gas Co. v. Universal Oil Prods.*, 572 S.W.2d 320, 329 (Tex. 1978) (stating that "[t]he seller should only be held liable for that portion of the consequential damages caused by the breach of implied warranty"); *Indust-Ri-*

installed the product incorrectly, are matters that are relevant to whether the product caused the plaintiff's damages.[39] We have already explained that the evidence allowed the trial court to conclude that ARCI did not materially violate the instructions that apply to installing the RapidGRIP in resolving issues one, six, seven, and eight.[40] For those same reasons, we reject the arguments that U.S. Ply uses to support issue nine.

In this case, the record contains conflicting testimony and evidence about whether ARCI installed RapidGRIP correctly and whether it applied the product in a manner consistent with the product's instructions and industry standards. In bench trials, the trial court determines the weight to give any testimony and resolves conflicts and inconsistencies in the testimony.[41] The evidence allowed the trial court to conclude that the RapidGRIP malfunctioned even though ARCI stored and installed it properly. We overrule U.S. Ply's ninth issue.

---

*Chem Lab., Inc. v. Par-Pak Co., Inc.,* 602 S.W.2d 282, 290 (Tex. App.—Dallas 1980, no writ) (extending the holding in *Signal Oil* to an express warranty claim).

[39] *See Par-Pak Co.*, 602 S.W.2d at 290.

[40] *See City of Keller*, 168 S.W.3d at 814; *Mar. Overseas Corp.*, 971 S.W.2d at 407.

[41] *See McGalliard*, 722 S.W.2d at 697; *Woods v. Woods*, 193 S.W.3d 720, 726 (Tex. App.—Beaumont 2006, pet. denied).

### 3. Was the testimony of Bradley Hughes, ARCI's roofing expert, properly admitted and does it provide reliable support for the verdict?

In issues two through five, U.S. Ply argues that Hughes' testimony was inadmissible for four reasons: (1) ARCI did not name him by the stated deadlines in the trial court's docket-control order; (2) he was not qualified by virtue of his training or experience to express opinions about RapidGRIP; (3) he was not qualified to express opinions about what caused the RapidGRIP to fail; and (4) his opinions were speculative because they did not have a sufficient foundation. We address these arguments in order.

Before trial, the trial court held a hearing to consider U.S. Ply's objections claiming that Hughes should not be allowed to testify in the case. In the hearing, U.S. Ply argued that the trial court should strike Hughes as a witness because ARCI failed to comply with the docket-control order controlling the discovery deadlines that applied to the case. During the hearing, ARCI argued the order required ARCI to produce Hughes' report no later than by mid-June 2016, and that it produced his report in late-January 2016, well before that docket-control order's deadline. When ruling on U.S. Ply's motion, the trial court advised the parties the court had decided to deny the motion.[42]

---

[42] The clerk's record contains an order granting U.S. Ply's motion to exclude Hughes as a witness, but the order contradicts the ruling the trial court made before

The record shows the trial court allowed Hughes to testify in the trial.[43] In late-May 2015, ARCI designated Hughes as an expert but did not produce his report. In late-January 2016, ARCI amended its designation of experts and produced a report, signed by Hughes. In an amended docket-control order, signed in late-March 2016, the trial court signed a new docket-control order, ordering discovery to conclude by September 12, 2016. The amended order does not specify the date by which the parties were to produce reports from their experts. Instead, the amended order provides: "If no date or limitation on discovery is given below, the item is governed by the Texas Rules of Civil Procedure."

Given this language, we look to the rules in the Texas Rules of Civil Procedure to determine whether ARCI violated the docket-control order that applies to resolving U.S. Ply's complaint that the trial court failed to enforce the deadlines that

---

the trial began. U.S. Ply does not rely on the signed order in its brief. Nevertheless, the hearing shows the trial court intended to sign an order overruling U.S. Ply's motion as the trial court stated that it would "allow the testimony of Mr. Hughes and overrule the objections of U.S. Ply. So I'm signing that order now." We conclude the trial court signed the order granting U.S. Ply's motion by mistake.

[43] During the hearing, U.S. Ply complained that ARCI failed to designate Hughes until March 2015 and that ARCI did not immediately produce his report at that time along with all information he relied on to form his opinions. After presenting the court with these complaints, U.S. Ply's attorney advised the court that Hughes should be excluded because he "was not timely designated as an expert[.]"

apply to Hughes' report. Under the Rules, ARCI needed to provide U.S. Ply with Hughes' report at least ninety days before September 12, 2016, the date on which the discovery period ended.[44] Thus, ARCI was required to produce Hughes' report by mid-June 2016.[45] The record shows that ARCI designated and produced Hughes' report more than four months before that deadline. We conclude the trial court properly rejected U.S. Ply's argument that ARCI failed to produce Hughes' report by the required deadline. We overrule U.S. Ply's second issue.

In issues three and four, U.S. Ply argues that Hughes lacked the qualifications needed to express reliable opinions explaining why the roofs installed at Sunningdale failed. In issue five, U.S. Ply contends Hughes based his opinions on unreliable tests performed on the leftover roll. According to U.S. Ply, the evidence shows that the leftover roll could not be subjected to testing capable of yielding reliable results because it was not in the condition it was in when it was delivered to Sunningdale. U.S. Ply concludes that because Hughes based his opinions almost

---

[44] *See* Tex. R. Civ. P. 195.2(a) (providing that unless the trial court orders otherwise, the parties must furnish the information required under Rule 194.2(f) 90 days before the end of the discovery period); *id.* 194.2(f) (providing that upon request, the party from whom disclosure has been requested must disclose information about the identity and the substance of the witnesses the responding party retained to testify as experts).

[45] *Id.*

entirely on the tests done on the leftover roll, his opinions are without foundation, making them speculative and unreliable.

An abuse-of-discretion standard applies to an appellate court's review of a trial court's decision admitting expert testimony.[46] Courts determine whether evidence is reliable from all the evidence.[47] Expert testimony is admissible when (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation.[48] "'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.'"[49] "'If the expert's scientific evidence is not reliable, it is not evidence.'"[50] If the opinion the expert expressed at trial "is based on assumed facts that vary materially from the actual, undisputed facts,

---

[46] *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 716 (Tex. 2016); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718-19 (Tex. 1998).

[47] *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997).

[48] *See Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006).

[49] *Id.* (quoting Tex. R. Evid. 702); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-89 (1993).

[50] *Mendez*, 204 S.W.3d at 800 (quoting *Havner*, 953 S.W.2d at 713).

the opinion is without probative value and cannot support a verdict or judgment."[51] That said, courts do not determine whether an expert's opinion is reliable by deciding whether the expert's opinion appears to be correct.[52] Rather, the factors courts use when determining if the expert's opinions are reliable look to the reliability of the method and analysis the expert used in forming the opinions the expert expressed in the trial.[53]

The qualifications Hughes possessed as a roofing expert are primarily those that are in his resume. Hughes' resume shows that he is licensed in the State of California as a general contractor and as a roofing contractor. He has more than thirty years of experience in the construction industry, and his experience includes supervising the construction of composite shingle, built-up, and other types of roofs that are installed on apartments, condominiums, and commercial buildings. Hughes' testimony shows that he also has experience with installing modified-bitumen roofs. Hughes also described his experience in the roofing industry when he testified. During the trial, Hughes testified that for the past eighteen years he has worked for

---

[51] *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); *see also Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 591 (Tex. 1999).

[52] *See Tamez*, 206 S.W.3d at 581.

[53] *Id.*

Bert Howe & Associates. According to Hughes, his day-to-day work for Bert Howe involves inspecting roofs, writing reports about his findings, analyzing the performance of roofs, and writing specifications for repairs, when required. Hughes testified that in the past eighteen years, he has inspected over 20,000 roofs. Hughes explained that before working for Bert Howe, he worked more than twenty years "within the roofing industry as a tradesman installing, repairing, [and] rehabilitating roofing systems . . . , which are inherent to modified bitumen applications such as [the] case [before the court.]" He explained that his experience installing roofs includes installing the type of modified-bitumen systems used at Sunningdale. He has also inspected modified-bitumen roofs in his work with Bert Howe, including taking samples from the existing roof and having those samples tested. Although Hughes represented that he had a great deal of experience with roofs, he also agreed that he was not a scientist, a chemist, or certified to conduct tests on roofing material, which is work done by labs.

Hughes' testimony reveals that he reviewed twelve categories of material while investigating the failure of the RapidGRIP used at Sunningdale. He did not inspect the roofs because they were repaired before he was hired. The information he reviewed included the instructions issued by U.S. Ply about RapidGRIP and how it is installed. He also reviewed testing and materials standards referenced on

36

RapidGRIP's label, industry standards for installing low-sloped-asphalt roofs, construction records associated with ARCI's work, weather records for the days ARCI installed the RapidGRIP, construction and inspection photographs taken of the roofs, and reports issued by BES about its observations and findings on the roofs. Hughes agreed that he relied heavily on U.S. Ply's and Mid-States Asphalt's testing of the leftover roll when reaching the opinions he expressed at trial.[54] He also agreed he has no experience in designing asphalt-roofing products, that he did not have an independent lab perform tests on any samples taken from Sunningdale's roofs, and that he is not a chemist. Hughes stated that he is qualified to express opinions about the performance of self-adhering membranes that contractors install on roofs from the perspective of a roofing consultant, inspector, and contractor.

As we understand Hughes' testimony, Hughes thought that the RapidGRIP ARCI used on the project failed to perform as a high tack, self-adhering membrane that could be applied without using supplemental heat. He also expressed the opinion that any errors ARCI made when installing the roofs did not contribute to causing the RapidGRIP ARCI installed to fail.

---

[54] Hughes stated that he understood the leftover roll had been stored properly before U.S. Ply and Mid-States Asphalt tested it. He also agreed that he had no personal knowledge about how the roll was stored to protect it from the elements before anyone tested it. Hughes acknowledged that the adhesive qualities of the roll could degrade if the roll was not stored properly.

U.S Ply contends the trial court should not have found that Hughes was qualified to testify as an expert. It argues that ARCI failed to show that Hughes had experience or expertise in manufacturing, designing, or marketing RapidGRIP. That said, ARCI sought to prove that the RapidGRIP malfunctioned because the RapidGRIP it purchased did not have the qualities represented on the label even when applied in a manner consistent with industry practices and the instructions on the product's label. Hughes did not testify the formula U.S. Ply used for RapidGRIP was incapable of producing a membrane consistent with the qualities stated on the label. Essentially, Hughes' testimony shows that he thought the problem with the RapidGRIP ARCI acquired occurred before they were delivered to Sunningdale because ARCI stored the rolls properly, installed the rolls properly, and that nonetheless, the RapidGRIP failed on both roofs.

As to the trial court's decision to allow Hughes to testify as a roofing expert, the record shows that Hughes has much more expertise evaluating roofs, including the type of roofs at issue here, than an ordinary factfinder. He has also evaluated many problems with roofs, and in his job, companies rely on him to determine why roofs fail and how they should be fixed. Under the Texas Rules of Evidence, opinions offered by witnesses who have "technical[] or other specialized knowledge" are admissible if the opinion assists the factfinder in deciding the issues

38

in dispute.[55] Had ARCI claimed the formula U.S. Ply used to create RapidGRIP would not produce a high-tack, self-adhering membrane, a scientist or manufacturing witness familiar with the manufacture of roofing membranes might have been an important witness for that trial. That was not, however, the theory ARCI advanced in this trial. Instead, ARCI sought to prove the RapidGRIP that it purchased malfunctioned in ways that were not consistent with the qualities stated on the product's label.

Given Hughes' experience in the roofing industry, we conclude the trial court could reasonably have found him qualified to express opinions about whether the product malfunctioned.[56] While Hughes had no formal training in manufacturing or designing roof membranes, experts need not always be formally trained to possess information that is helpful to triers of fact. For instance, in discussing qualifications of experts, the Texas Supreme Court explained that an "experienced car mechanic's diagnosis of problems with a car's performance may well be relevant and reliable without resort to engineering principles."[57]

---

[55] Tex. R. Evid. 702.

[56] *See Gammill*, 972 S.W.2d at 722 (noting that "there are many instances when the relevance and reliability of an expert witness's testimony *are* shown by the witness's skill and experience").

[57] *Id.*

The trial court's conclusion that Hughes followed a proper methodology to arrive at his opinions is also reasonable and supported by the record. Hughes' testimony reveals he is familiar with industry practices for installing modified-bitumen roofs. His testimony shows that he is familiar with the manner and conditions under which products like RapidGRIP are used. His testimony shows that he considered whether the product was stored or installed improperly and that he considered the test results on the leftover roll. His conclusion that the RapidGRIP malfunctioned as a self-adhering membrane at the temperatures it which it was installed represents a reasoned opinion reached after considering the available evidence. We conclude that Hughes was qualified to express the opinions he expressed that U.S. Ply has challenged in the appeal. We overrule issue three.

In issues four and five, U.S. Ply criticizes the methodology Hughes followed in arriving at his opinions. According to U.S. Ply, Hughes ignored uncontroverted testimony showing that the leftover roll was not in the same condition it was in when it was delivered to Sunningdale. Also, U.S. Ply suggests that the methodology Hughes should have followed required him to submit samples of the RapidGRIP to an independent lab. According to U.S. Ply, testing by an independent lab is normally performed to determine what caused a roof to fail. U.S. Ply concludes that errors in Hughes' methodology makes his opinions speculative and unreliable.

40

The Texas Rules of Evidence allow experts to base opinions "on facts or data in the case that the expert has been made aware of, reviewed, or personally observed."[58] The testimony about how the leftover roll was stored before U.S. Ply and Mid-States Asphalt tested it was largely circumstantial. There is, however, direct testimony showing that Marshall acquired the leftover roll from ARCI employees who took it from one of the roofs at Sunningdale. When the partial roll arrived at ARCI's offices, it was not in a box. There is, however, testimony showing that U.S. Ply sent the leftover roll to Mid-States Asphalt in a box. Other than this testimony, the evidence is circumstantial about whether ARCI stored the leftover roll properly before ARCI's employees gave it to Marshall. That said, the testimony does not show the leftover roll was ever exposed to extreme cold or heat or that the leftover roll was exposed to weather, including sunlight, for more than 90 days before the leftover roll was tested.

There is also no testimony showing that Mid-States Asphalt considered its tests unreliable, that Mid-States Asphalt considered its testing insufficient without further testing by an independent lab, or that the leftover roll could not be tested to determine whether the RapidGRIP ARCI purchased could be applied without using a torch. The fact that Mid-States Asphalt offered to replace the product after

---

[58] Tex. R. Evid. 703.

completing its tests is circumstantial evidence supporting the trial court's inference that Mid-States Asphalt concluded the roll did not have the qualities of tackiness stated on the product's label. Based on the direct and circumstantial evidence, and because the product's label states that the product should not be "left exposed for more than 90 days[,]" the trial court could have reasonably rejected U.S. Ply's arguments that U.S. Ply's and Mid-States Asphalt's tests were not reliable or relevant to proving what condition the rolls were in when ARCI acquired them.

Next, we turn to U.S. Ply's claim that Hughes' opinions were unreliable because he failed to have samples of the RapidGRIP tested by an independent lab. There is no testimony in the record showing what constitutes a normal investigation when evaluating what caused a modified-bitumen roof (or any other type of roof) to fail. There is also nothing in the record showing that the proper methodology for determining the cause of a roof's failure requires testing beyond the testing done by the entities that manufactured and sold the roofing products used in building the roof. Mid-States Asphalt and U.S. Ply both relied on their testing to extend remedies for the RapidGRIP's failure without submitting the leftover roll or other samples of the RapidGRIP for further testing by an independent lab. Moreover, before extending their respective offers, neither U.S. Ply, nor Mid-States Asphalt, suggested that more testing was needed by an independent lab.

Finally, the opinions Hughes expressed are supported by testimony that is in the record explaining how ARCI built the roofs. ARCI has a long track record of successfully building modified-bitumen roofs using membranes like RapidGRIP. The tests on the leftover roll were done before the useful life for the product, as shown on the product's label, expired. This factor also tends to support the trial court's implied findings. While the record contains conflicting evidence about how ARCI stored and installed the roofing materials before it used them, Hughes was entitled to assume that ARCI stored and installed the RapidGRIP properly when forming his opinions given the evidence presented in the trial. We conclude the trial court did not rely entirely on Hughes' credentials when it found Hughes gave credible and reliable testimony in the trial.

To summarize our conclusions, Hughes' opinions were not speculative, conclusory, or without a sufficient foundation to tie his opinions to the relevant facts of the case. We hold the trial court did not err by exercising its discretion to allow Hughes to testify or by finding that he gave credible and reliable opinions during the trial. We overrule issues four and five.

### 4. Did U.S. Ply preserve its right to obtain the trial court's written findings to explain its verdict?

In issue ten, U.S. Ply asserts that given U.S. Ply's request for findings, the trial court erred by failing to provide the parties with written findings of fact and

conclusions of law. The record shows that U.S. Ply filed its request for findings within twenty days of the date the trial court signed the judgment. We conclude that U.S. Ply's initial request for findings was timely.[59] Even so, U.S. Ply then failed to file a notice of past due findings. A notice of past due findings is required when a trial court has failed to comply with a party's initial request for written findings.[60] If a party fails to file a notice of past due findings, it can no longer complain of the trial court's failure to provide the parties with written findings.[61] We conclude that U.S. Ply waived its right to complain about the trial court's failure to reduce its findings to writing. We overrule U.S. Ply's tenth issue.

## Conclusion

Having carefully considered each of U.S. Ply's issues, we affirm the trial court's judgment.

AFFIRMED.

---

[59] *See* Tex. R. Civ. P. 296, 297.

[60] *See id*. 297.

[61] *See Ad Villarai, LLC,* 519 S.W.3d at 137 (Tex. 2017); *Las Vegas Pecan & Cattle Co. v. Zavala Cty.*, 682 S.W.2d 254, 255-56 (Tex. 1984).

_____
HOLLIS HORTON
Justice

Submitted on December 19, 2018
Opinion Delivered April 25, 2019

Before McKeithen, C.J., Horton and Johnson, JJ.